UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
─────────────────────────────
                              )
MANUEL s. COSTA, III,         )
                              )
            Plaintiff,        )
                              )        CIVIL ACTION NO.
         v.                   )        10-CV-10023-PBS
                              )
MICHAEL J. ASTRUE,            )
Commissioner of               )
Social Security,              )
                              )
            Defendant.        )
─────────────────────────────)
```

**MEMORANDUM AND ORDER**
March 25, 2011

Saris, U.S.D.J.

## I.  INTRODUCTION

Plaintiff Manuel S. Costa, III, who suffers from back pain, migraines, dependence on pain killers and various physical and mental impairments, challenges the final decision of the Commissioner denying him Social Security disability benefits. After a review of the record, the Court **DENIES** Plaintiff's Motion for an Order Reversing the Decision of the Commissioner, and **ALLOWS** Defendant's Motion for an Order Affirming the Decision of the Commissioner.

**A.    Employment and Medical History**

Plaintiff, who is a thirty-eight year old male, completed the tenth grade and obtained a GED.  (Administrative Transcript ("Tr.") at 91, 123.)  The plaintiff formerly worked in maintenance, repairing group homes for children.  Then, in 2004, he injured his back and did not return to work for about two years. (Tr. at 26-28, 923.)  When he did return to work, the plaintiff served as a finishing carpenter and worked for about four months before leaving work again as a result of back pain. (Tr. 26.)

**1. Medical Evidence**

   **a. Physical Impairments**

      **i. Back Pain**

Plaintiff's first medical problems occurred in 2004 when he began experiencing persistent back pain.  In January 2004, Dr. Kwan diagnosed him with thoracic/lumbar strain.  (Tr. at 925.) In March 2004, neurosurgeon Dr. Choo diagnosed "low back pain and bilateral scintice" and "central disc herniation."  (Tr. at 922.) That same month, Dr. Jenis of the Boston Spine Group reviewed the plaintiff's MRI scan and found "disc degeneration" and "a very small central disc herniation coming into contact with the thoracic sac."  (Tr. at 924.)  Dr. Jenis did not order surgery

but suggested a pain management and restoration program. (Tr. at 924.) The plaintiff was then evaluated by the New England Baptist Hospital Spine Center, which concluded that plaintiff had "mild disk degeneration L5-S1 and a small central disk herniation at that level." (Tr. at 1001.) The doctor prescribed a more aggressive spine rehabilitation program and suggested that the plaintiff "try to wean" off Percocet in conjunction with beginning rehabilitation. (Tr. at 1001.) In May of 2004, the plaintiff was evaluated at the Occupational Medical Center at New England Baptist Hospital. The doctor there reported that "my examination at this time is really quite normal...[plaintiff] has got a chronic pain issue for some unknown reason." (Tr. at 1005.) In December 2004, plaintiff underwent L5-S1 epidural steroid injections, which, along with physical therapy, helped to resolve his issues. (Tr. at 929, 953.)

On June 4, 2006, plaintiff was seen at Caritas Norwood Hospital complaining that his back pain had returned after a day of mixing cement. (Tr. at 953.) The doctor diagnosed the plaintiff with lower back strain and prescribed Percocet. (Tr. at 953.) Then, on June 9, 2006, plaintiff was seen at the Beth Israel Hospital emergency room for back pain and again prescribed Percocet. (Tr. at 938.) On June 14, the plaintiff began treatment with Dr. Kornitzer at Mass. General Hospital. (Tr. 225, 948.) On June 19, 2006, the plaintiff reported to the emergency

room with worsening back pain. (Tr. at 222, 949.)  On June 23,
2006, he was examined and the treating physician noted that the
plaintiff's "L5-S1 has a centralized bilateral impingement of S1
nerve."  (Tr. at 218.)  The doctor recommended continued
percocet. (Id.)

On July 12, 2006, the plaintiff was admitted to Mass.
General Hospital emergency observation unit for lower back pain
and leg weakness. (Tr. at 192.)  After a follow-up appointment on
August 1, 2006, Dr. Kornitzer discontinued Tylenol, Ibuprofen,
and Flexeril, and prescribed Oxycodone and Diazepam. (Tr. at
210.)  A few weeks later, the plaintiff saw Dr. Mostoufi who
noted that the plaintiff's pain management had involved, mainly,
use of "oral agents," including Oxycodone, with which the
plaintiff "ha[d] been responsible." (Tr. at 212.)

In September, plaintiff had X-rays taken which were found to
be "relatively benign except there is a slight narrowing at S5-
L1." (Tr. at 206.)  On October 24, 27, and 28, 2006, the
plaintiff was seen at Sturdy Memorial Hospital. (Tr. at 579.)  He
was initially prescribed Oxycodone but returned on October 27,
2006.  (Tr. at 579, 580.)  The doctor, who saw him at this next
visit, noted, "The patient was actually seen here on October 24,
2006, three days prior to this admission, and was given a
prescription of Oxycodone." (Tr. at 580.)  The next day the
plaintiff returned to the ER, again stating he ran out of his

Oxycodone prescription and could not make it to his follow-up "due to insurance purposes and moving." (Tr. at 581.)  The plaintiff was once again given Oxycodone. (Tr. at 581-582.)

On November 14, 2006, the plaintiff returned to Sturdy Memorial Hospital reporting "right flank pain with pain radiating around to his right abdomen." (Tr. at 584.)  The treating doctor reported that the plaintiff "requested some additional pain medication to go home with as he is chronically on Oxycodone and he states he is out." (Id. at 584.)  The plaintiff reported back to Caritas Norwood on November 25, 2006.  He reported intractable pain in the right lumbar area radiating to his right leg.  After this meeting, the treating doctor gave the patient twenty Percocet and advised him to follow-up with his primary care physician. (Tr. at 954, 964.)

A few months later on February 16, 2007, plaintiff claimed to have slipped on some ice and was prescribed Percocet.  (Tr. at 588.)  Less than two weeks later, on February 25, 2007, plaintiff was treated at Rhode Island Hospital claiming he hurt his back lifting belongings into his apartment. (Tr. at 236.)  Then, on February 27, 2007, he claimed to have back pain from a car accident a week earlier; he was prescribed Percocet (Tr. at 592-93.)  On March 9, 2007, the plaintiff returned to Sturdy Memorial for back pain and was once again prescribed Percocet. (Tr. at 594.)  On April 17, 2007, the plaintiff again reported to Rhode

Island Hospital's emergency room complaining of back pain after helping a homeless man out of his car. (Tr. at 243.) The plaintiff returned the next day and received Vicodin, then returned one day later and three days after that. (Tr. at 244, 253, 263.) On April 29, plaintiff appeared at Sturdy Memorial claiming to have back pain after falling down eight indoor steps on to his back. (Tr. at 598.) On May 1, 2007, the plaintiff again went to Rhode Island Hospital and said he fell down eight stairs. (Tr. at 269.) On the same day, plaintiff went to Sturdy Memorial claiming back pain, but he made no mention of falling down stairs. (Tr. at 600.)

On November 2, 2007, plaintiff was seen at Norton Medical Center claiming he needed a refill of his Oxycodone due to the fact that his prescription was stolen. (Tr. at 530.) The doctor agreed to dispense the medication if provided with a police report. (Tr. at 530.) On November 12, plaintiff returned to the Norton Medical Center claiming back pain and that he ran out of Oxycodone. (Tr. at 532.) This time plaintiff claimed that his girlfriend washed his pants with his prescription in them. (Tr. at 532.) The treating doctor also noted that although treatment providers had made a decision to taper medication, the plaintiff had escalated his medication without doctor approval. (Tr. at 532.) The doctor noted "it is unclear whether the patient is a

drug seeker at this point or if he comes with a legitimate
complaint." (Tr. at 534.)

On December 28, plaintiff actually denied back pain while
being treated for a headache at the hospital. (Tr. 548, 549.) On
January 7, 2008, plaintiff received more Oxycodone for his lower
back pain and other health problems discussed further below. (Tr.
at 737.) On January 21, plaintiff appeared at the emergency room
at Sturdy Memorial claiming that he ran out of his pain
medication and that "he ha[d] been sneezing more often recently
which [might have been] making his back pain worse." (Tr. at
641.) The doctor gave him Oxycodone and suggested he follow up
with his primary care doctor for all pain issues. (Tr. at 641.)
On the same day, the plaintiff had an office visit with Dr.
Ilyavsky at Norton Medical Center. (Tr. at 554.)Dr. Ilyavsky
asked the plaintiff if he was getting narcotics elsewhere, which
the plaintiff denied. However, the doctor received word that the
plaintiff had a prescription from another doctor. (Tr. at 554.)
He advised the plaintiff that he should seek rehab and told him
he would not prescribe him any more narcotics due to his
"dishonest behavior and obtaining multiple scripts from other
prescribers." (Tr. at 555.)

On February 2, plaintiff went to Sturdy Memorial claiming he
ran out of the Oxycodone prescribed by his primary care doctor.
(Tr. at 651.) The treating doctor gave him more Oxycodone. (Tr.

at 651.)  On February 17, plaintiff returned to Sturdy Memorial complaining of back pain and received even more Oxycodone.  (Tr. at 653.)  On February 23, plaintiff complained of back pain he believed to be related to his kidney problems.  He once again received Oxycodone.  (Tr. at 656.)  On February 26, plaintiff returned to Sturdy Memorial and was again given Oxycodone; however, at this visit the treating doctor stated he should follow up with his primary care physician who "knows him better." (Tr. at 658-659.)  The very next day the plaintiff went to Rhode Island Hospital complaining of flank pain and was given Percocet. (Tr. at 563.)

On March 8, plaintiff returned to Sturdy Memorial claiming he had run out of his prescriptions because his insurance had dropped him, and, therefore, he could not see his primary care doctor. (Tr. at 660.)  The doctor once again gave him Oxycodone and suggested alternatives to visiting the emergency room for pain. (Tr. at 660.)  On March 22, plaintiff claimed his prescription was stolen out of his car at Foxwoods Casinos, and he received more Oxycodone. (Tr. at 662.)  On April 20, plaintiff went to the emergency room requesting more Oxycodone, stating he had an appointment with a primary care doctor but not until that Friday. (Tr. at 663.)  When only given one tablet, he requested more. (Tr. at 663.)  On April 24, the plaintiff went to Rhode Island Hospital and received Oxycodone; he also signed a pain

contract agreeing that he would only receive his medication from Rhode Island Hospital. (Tr. at 749.)

In August, plaintiff was seen at Milford Regional Medical Center. (Tr. at 793.) The plaintiff was given Oxycodone but was told "he would not be given any further narcotic medication from this ER for his chronic pain conditions." (Tr. at 793.)

On January 5, 2009, plaintiff was seen at Rhode Island Memorial Hospital for flank pain and given Oxycodone. (Tr. at 890.) Plaintiff returned on January 20 with flank pain and was once again given Oxycodone. (Tr. at 894.) On February 24, he visited North Attleborough Medical Center complaining of back pain. (Tr. at 1074.) His record from this visit notes his drug dependence. (Tr. at 1074.)

### ii. Burns

In May 2007, the plaintiff sustained burns on his face, chest, upper extremities, and upper back after a gasoline explosion. (Tr. at 287.) The plaintiff received a skin graft on his left arm and began receiving Oxycodone for this injury. (Tr. at 474, 297.) On July 2, 2007, plaintiff received more Oxycodone. (Tr. at 714.) Later, the plaintiff returned to the Rhode Island Hospital burn clinic on an unscheduled day complaining of "out of control" pain even though the burns seemed to be well healed. (Tr. at 723.) The plaintiff received more Percocet in September despite largely normal examinations. (Tr.

at 614, 619.)  After this meeting, the doctor stated there "was
no evidence of significant worsening."  (Tr. at 614.)  Dr.
Harrington noted in May 2008 that the plaintiff's full range of
motion would not be limited by pain as a result of the burns.
(Tr. at 666.)

### iii. Shoulder Pain

In September 2008, plaintiff was seen at Rhode Island
Hospital claiming shoulder pain resulting from his earlier gas
explosion accident, and because he was out of Oxycodone.  (Tr. at
801.)  In September 2008, physician's assistant Gary Mousseau
noted that the plaintiff could not use his right arm; however, he
could use his left arm and sit for long periods of time. (Tr.
847.)  In October, plaintiff called Boston Medical Center with
severe shoulder plain.  He claimed to have been off pain
medication for six weeks in order to make pain management easier
after the plaintiff's impending surgery. (Tr. at 807.)

Plaintiff underwent shoulder surgery in October 2008 and was
given Oxycodone during recovery. (Tr. at 973.)  The surgery
revealed that the plaintiff's complaints were not consistent with
an injury involving such pain.  After this was explained to the
plaintiff, he "became belligerent regarding the cause of his
shoulder pain...and demand[ed] stronger pain medication."  (Tr.
at 976.)  The doctor further stated that the plaintiff was
requesting more pain medication which was "out of the ordinary"

for this type of procedure and surgical findings.  (Tr. at 977.)

### iii. Chest Pain

The plaintiff presented himself at Sturdy Memorial on April 9, 2007 complaining of chest pains "constantly" for three weeks. (Tr. at 236.)  On November 26, 2007, plaintiff went to Rhode Island Hospital complaining of chest pain and shoulder pain. (Tr. at 443.)  The doctor prescribed Oxycodone.  (Tr. at 444.)

### iv. Asthma

The plaintiff has a diagnoses of asthma and receives medications for this ailment. (See Tr. at 749.)

### v. Headaches

Plaintiff complained of headaches in February 2006.  He went to the emergency room in September 2006 for a severe headache. (Tr. at 576.)  On August 20, 2007, plaintiff saw Dr. Ilyvsky for a shooting headache.  (Tr. at 494.)  On August 22, plaintiff was seen again for headaches.  (Tr. at 611.)  Plaintiff was given a CT scan which was found unremarkable.  (Tr. at 613.)

On August 23, 2007, the plaintiff was seen for dizziness. (Tr. at 413.)  A CT scan was done and the impression was normal. (Tr. at 423.)  On December 27, 2007, plaintiff complained of a 24-hour headache on the left-side. (Tr. at 635.)  The plaintiff received Dilaudid and Zofran. (Tr. 636.)  On December 29, 2007, plaintiff again went to the emergency room with a headache.  (Tr.

at 637).  The plaintiff was again given Dilaudid and Zofran. (Tr. at 637.)  At the time of the hearing, the plaintiff still claimed to suffer from migraines which caused vomiting and light sensitivity. (Tr. at 32.)

### b. Mental Impairments: Anxiety & Depression

The plaintiff was diagnosed with depression in 2004.  (Tr. at 1066.)  At Tufts Medical Center in July 2006, plaintiff complained of "depression, anxiety, mental disturbance, [and] suicidal ideation." (Tr. at 1061.)  On June 5, 2007, plaintiff admitted to feeling depressed and having trouble sleeping.  (Tr. at 311.)  Dr. Ilyevsky diagnosed the plaintiff with anxiety and placed him on Diazepam.  (Tr. at 122, 166, 179, 476.)  Plaintiff was evaluated at South Bay Mental Health Center on August 1, 2007. (Tr. at 857.)  He was diagnosed with "depression, anxiety, panic, agoraphobia, and fear of injuries."  (Tr. at 859.)  Plaintiff went to therapy sessions from August 2007 to July 2008. (Tr. at 859-881.)  His therapist, Ms. Wilson, reported that plaintiff "gets distracted by... [his] worries," has a bad short term memory, and has difficulty completing tasks. (Tr. at 698.)

Plaintiff saw Dr. Gitlow at the Massachusetts Rehabilitation Commission in July 2008. (Tr. at 770.)  Gitlow diagnosed plaintiff with "an adjustment disorder with mixed disturbance of mood and anxiety" as well as some side effect symptoms from Diazepam.  (Tr. at 771.)  Gitlow went on to explain that he did

not believe this was a substance abuse problem.  (Tr. at 771.)
He stated that the plaintiff's "psychiatric symptoms alone are
causing a moderate impairment of concentration, persistence, and
pace but. . .[they] are not causing difficulties with activities
of daily living or with social interactions.  These issues are
impacted, however, by his non-psychiatric medical issues." (Tr.
at 772.)

On August 1, 2008, Dr. Phillips also prepared a psychiatric
evaluation. (Tr. at 774.)  Dr. Phillips noted that the plaintiff
had an opioid dependence. (Tr. at 782.)  He further stated that
the plaintiff's restriction of activities of daily living were
"mild."  (Tr. at 784.)  His difficulties in maintaining
concentration, persistence, or pace as well as the difficulties
maintaining social functioning were "moderate."  (Tr. at 784.)
The plaintiff was ruled not to be significantly limited in his
ability to understand or remember simple short instructions.
(Tr. at 788.)  The plaintiff was markedly limited in his ability
to carry out detailed instructions.  (Tr. at 788.)  The plaintiff
was "moderately limited" in his ability to "sustain an ordinary
routine without special supervision[;]...ability to maintain
attention and concentration for extended periods of
time[;]...ability to perform activities within a schedule,
maintain regular attendance, and be punctual within customary
tolerance[;]...ability to complete a normal workday and workweek

13

without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods[; and]...the ability to respond appropriately to changes in work setting." (Tr. at 788.)

In February of 2009, Dr. Marsha Tracy examined the plaintiff. She determined that the plaintiff's mental impairments were not severe. (Tr. at 907.) Dr. Tracy also noted that the plaintiff's anxiety would not be as "severe if he was not abusing substances." (Tr. at 919.)

B. **Hearing and ALJ Decision**:

1) **The Hearing**:

At the hearing, the ALJ heard the testimony of three witnesses. First, the plaintiff testified at length about his medical and personal problems, his daily routine, and his relationship with prescription narcotic painkillers, on which he claimed not to be dependant. (Tr. at 24, 30, 32.) Second, Dr. John A. Pella, a medical expert, testified regarding his extensive review of the record in this case. (Tr. at 40.) Dr. Pella's expert opinion was that the plaintiff was limited to sedentary work with limited use of the right upper extremity as a result of the plaintiff's burns. (Tr. at 43.) Finally the ALJ heard the testimony of Vocational Expert Mike Larrea. (Tr. at 44.) Larrea testified that given the limitations identified by the medical expert, the plaintiff would be able to perform about

1050 jobs in the regional economy. (Tr. at 45.)  However, the Vocational Expert testified that if severe migraines entailing vomiting and light-sensitivity were also taken into account, then the plaintiff would be precluded from all employment opportunities. (<u>Id.</u>)

### 2) ALJ Decision

After considering the hearing testimony and the extensive record, the ALJ determined that the plaintiff was not entitled to benefits.  The ALJ first determined that the plaintiff was severely impaired as a result of "chronic low back pain, chronic right shoulder pain, asthma, and burns to the upper body." (Tr. at 9.)  However, the ALJ found the plaintiff's "alleged depression and anxiety" to be non-severe impairments. (Tr. at 9.)  He based this conclusion on Dr. Tracy's report and the fact that the plaintiff had reported stable depression and anxiety in recent visits with his primary care physician. (<u>Id.</u>)  The ALJ also found the plaintiff's migraines and vertigo to be non-severe.  He held that "[t]here is virtually no documentation in the record of these impairments. . [and that the plaintiff] has not required treatment by a specialist for either of these conditions." (<u>Id.</u>)

The ALJ then found that the plaintiff had no impairment or combination of impairments that would necessarily preclude gainful employment under 20 CFR Part 404, Subpart P, Appendix 1.

15

Though the plaintiff had some severe impairments, none manifested in ways that would necessarily disrupt his ability to perform work under the regulations.  For example, the ALJ found that though the plaintiff has severe back pain, "there is no evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss or positive straight-leg raising rest." (Tr. at 10.)  Similarly, the plaintiff's shoulder problems, burns, and asthma, also all severe impairments, did not exhibit symptoms that would make them one of the listed impairments in 20 CFR Part 404.

The plaintiff's mental impairments, considered singly and in isolation, also did not meet the criteria of listings 12.04 and 12.06 of the regulations. (Id.)  In order to meet these criteria, the impairments must result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Tr. at 10.)  The ALJ found no indication that the plaintiff's mental impairments caused more than mild restrictions. (Id.)  He maintained social relationships with family, and he was able to clearly testify at the hearing. (Id.) "Extensive examinations by numerous doctors have indicated normal psychiatric and

neurological functioning. . . . Further, as recently as February 2009, the claimant reported his depression and anxiety to be stable." (Id.)

The ALJ also found that despite the fact that the plaintiff was no longer able to perform his prior work, his residual functional capacity (RFC) allowed him to perform some types of sedentary work. In regard to the plaintiff's back pain, the ALJ performed an extensive review of the plaintiff's medical history, including his repeated visits to the emergency room and found that "[o]verall, in regard to back pain, the record demonstrates that the claimant consistently reported severe pain and restriction despite frequent normal physical and neurological examinations. [The history] also reveal[ed] that claimant had severe drug-seeking behavior that likely caused him to exaggerate the severity of his pain." (Tr. at 13-15.) In regard to the plaintiff's shoulder pain, the ALJ noted that the plaintiff seemed to improve after each of his treatments, even though he failed to follow through with treatments. Moreover, though the shoulder pain may present some limitations, it does not "limit his ability to perform full-time work." (Tr. at 15.) Plaintiff's burns at one point might have presented a significant impediment to gainful employment, but based on the testimony of the plaintiff's treating physicians, the ALJ found that the plaintiff had completely recovered from these injuries by the time of the

hearing. (Id.)  Finally, the ALJ found that the plaintiff's asthma had a benign history and that his asthma treatments allowed him to work without disruption. (Id.)

The plaintiff's mental impairments also did not undermine his RFC to perform sedentary work.  The ALJ noted that the "record is quite limited in regards to mental illness," but found that "overall. . .the record reveals that the claimant's depression and anxiety is currently stable without medications and that it never reached a level where it seriously impaired his daily functioning." (Tr. 16.)  In 2007, the plaintiff began seeing Ms. Wilson complaining of depression and anxiety brought on mainly by stressful events in his life.  The ALJ noted that though Ms. Wilson did not perform "mental status exams or any cognitive testing," there was evidence that during this period, the plaintiff remained capable of performing tasks of daily living. (Id.)  In July 2008, the plaintiff had a psychiatric consultative examination, which resulted in a diagnosis of an "adjustment disorder" and a finding that he had "no limitations in social functioning or activities of daily living." (Id.)  By February 2009 the plaintiff reported that his depression and anxiety were stable. (Id.)

The ALJ then considered whether the subjective symptoms of the plaintiff's impairments would affect his ability to do work.  "After careful consideration of the evidence, [the ALJ found]

18

that the [plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment." (Tr. at 17.)

With regard to the plaintiff's reports of severe and disruptive pain, the ALJ found his testimony not credible in light of the relatively benign findings during his numerous visits to health service providers, and the plaintiff's drug seeking behavior, which created an incentive to over-report pain. (Id.) Specifically, the ALJ found that there was nothing in the record to indicate that the plaintiff suffered from severe migraines or vertigo, nothing to suggest that his chronic back and shoulder pain should continue to present significant problems interfering with his ability to do full-time work, and no persuasive evidence indicating that the plaintiff's memory, concentration, anxiety or depression issues were disruptive. (Id.) The ALJ found that "there is no objective evidence to substantiate [the plaintiff's] claims of diminished functioning," and that the plaintiff's subjective complaints were not credible (Id.)

The ALJ went on to explain the weight he gave testimony regarding the plaintiff's limitations. Regarding physical

limitations, the ALJ gave the following evidence considerable
weight: 1)the opinion of Dr. Harrington, the plaintiff's burn
specialist in 2007 and 2008, who found that the plaintiff had no
pain restrictions resulting from his burns and that the
plaintiff's range of motion was normal; 2) the opinion of Dr.
Pella, an impartial medical expert who testified that the
claimant was limited to sedentary work with restrictions
consistent with the ALJ's RFC findings; and 3) the opinion of Dr.
Palmeri a DDS physician who found that the plaintiff could
perform light work with limited use of the right upper extremity.
Overall, the ALJ gave more weight to Dr. Pella's opinion
regarding RFC, but found that the difference of opinion between
Dr. Pella and Dr. Palmeri did not have an impact on the overall
disposition. (Tr. at 18.)  The ALJ did not give significant
weight to the opinion of physician's assistant Gary Moussea, who
reported in September 2008 that the plaintiff's right shoulder
problems prevented him from doing any work. (Id.)  The ALJ noted
that Mr. Moussea failed to provide any objective evidence and
that his opinion predated the plaintiff's surgery, which
apparently alleviated his shoulder problems because the plaintiff
did not return for follow-up assistance. (Id.)

The ALJ gave considerable weight to the opinion of Dr.
Marsha Tracy regarding the plaintiff's mental impairments.  In
2009, Dr. Tracy completed an assessment finding that the

plaintiff suffered mild limitations in activities of daily living, maintaining social functioning, and concentration/persistence/pace. (Tr. at 19.)  She also found that the plaintiff's mental impairments were non-severe. (Id.)  In contrast to these opinions, the ALJ gave less weight to the August 2008 opinion of Dr. Phillips, which reported mild restrictions in activities of daily living, and the May 2008 opinion of Ms. Wilson.  The ALJ found Dr. Tracy's opinion to be more convincing because it was based on more recent evidence. (Id.)  Moreover, the ALJ found Ms. Wilson's report to be inconsistent not only with the record as a whole, but also with Ms. Wilson's own notes, which suggested that the plaintiff's limitations were not severe and that he exhibited a high level of functioning. (Id.)

Finally, though the ALJ found that the plaintiff could not perform his prior work, considering his RFC, there are jobs existing in significant numbers in the national economy that the claimant can perform. (Tr. at 20.)  The ALJ accepted the opinion of the Vocational Expert who found that given the plaintiff's limitations, age, education, and work experience, the plaintiff would be able to perform approximately 300 jobs in "Security," 500 jobs in "Assembly," and 250 jobs in "Production/Inspection," within the Rhode Island and southeastern Massachusetts regional economy. (Tr. at 20.)  The ALJ concluded, based on this

testimony, that there a significant number of jobs available to the plaintiff in the national economy, and, therefore, that the plaintiff was not disabled. (Id.)

### III. STANDARD

**A.    Disability Determination Process**

For an individual to obtain Social Security disability benefits, he must demonstrate that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An impairment can only be disabling if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).

The Commissioner has developed a five-step sequential evaluation process to determine whether a person is disabled. See 20 C.F.R. § 404.1520(a)(4); see also Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).  "Step one determines whether the plaintiff is engaged in 'substantial gainful activity.'  If he is, disability benefits are denied.  If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments."  Bowen v. Yuckert, 482 U.S. 137,

140-41 (1987) (internal citations omitted).  To establish a severe impairment the Plaintiff must "show that he has an 'impairment or combination of impairments which significantly limits . . . the abilities and aptitudes necessary to do most jobs.'"  Id. at 146 (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b)).

If the claimant has a severe impairment, the third step is to determine "whether the impairment is equivalent to one of a number of listed impairments that . . . are so severe as to preclude substantial gainful activity."  Id. at 141 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).  If so, the claimant is conclusively presumed to be disabled.  Id.  If not, the fourth step evaluates whether the impairment prevents the claimant from performing his past work.  Id.  The claimant is not disabled if he is able to perform his past work.  Id. (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)).  If he cannot perform his past work, the burden shifts to the Commissioner on the fifth step to prove that the claimant "is able to perform other work in the national economy in view of his age, education, and work experience."  Id. at 142, 146 n.5.  During steps one, two, and four, the burden of proof is on the claimant.  Id. at 146, n.5.  At the fifth step, the burden is on the Commissioner.  Id. at 142.  If the Commissioner fails to meet this burden, the claimant is entitled to benefits.  Id.

**B.   <u>Standard of Review</u>**

In reviewing disability and disability insurance decisions made by the Commissioner, the Court does not make <u>de</u> <u>novo</u> determinations.  <u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981).  Rather, this Court "must affirm the [ALJ's] findings if they are supported by substantial evidence."  <u>Cashman v. Shalala</u>, 817 F. Supp. 217, 220 (D. Mass. 1993); <u>see also</u> <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987) (stating that the ALJ's determination must be affirmed, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence").

Substantial evidence is "more than a mere scintilla." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is such relevant evidence as a "reasonable mind, reviewing the evidence in the record as a whole, could accept . . . as adequate to support [the ALJ's] conclusion."  <u>Irlanda Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (quoting <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981)).  In reviewing the record for substantial evidence, the Court is "to keep in mind that '[i]ssues of credibility and the drawing of permissible inferences from evidentiary facts are the prime responsibility of the [ALJ].'"

24

Rodriguez, 647 F.2d at 222 (quoting Rodriguez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965)). When a conflict exists in the record, the ALJ bears the duty to weigh the evidence and resolve material conflicts in testimony. See Richardson, 402 U.S. at 399; see also Irlanda Ortiz, 955 F.2d at 769.

In addition to considering whether the ALJ's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. "Failure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal." Weiler v. Shalala, 922 F. Supp. 689, 694 (D. Mass. 1996) (citing Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982)).

## VII. Discussion

A.   **Back Pain**

Plaintiff argues that the ALJ underestimated the plaintiff's back pain by not giving appropriate weight to the plaintiff's subjective complaints of pain. In regard to pain, the Social Security Act states

> There must be medical signs and findings,
> established by medically acceptable clinical or
> laboratory diagnostic techniques, which show the
> existence of a medical impairment ... which could
> reasonably be expected to produce the pain ...
> alleged....

42 U.S.C. § 423(d)(5). When evaluating a subjective complaint of pain, the ALJ should begin by looking at whether there is a "clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." Makuch v. Halter, 170 F.Supp.2d 117, 126 (D.Mass. 2001) (quoting Avery v. Secretary of Health and Human Serv., 797 F.2d 19, 21 (1st Cir. 1986)). In making this determination, the ALJ should consider "other evidence including statements of the claimant or his doctor, consistent with the medical findings." Makuch, 170 F.Supp.2d at 126. However, "[t]his does not mean that any statements of subjective pain go into the weighing." Id. The ALJ may determine that plaintiff's complaints "are not consistent with objective medical findings of record[,]" as long as the ALJ's determination is supported by evidence in the record. Evangelista v. Secretary of Health and Human Serv., 826 F.2d 136, 141 (1st Cir. 1987).

If the ALJ is unable to find medical evidence to substantiate the alleged pain, then the ALJ must look to the "Avery" factors. The ALJ

> must be aware that symptoms, such as pain, can result in greater severity of impairment than may be clearly demonstrated by the objective physical manifestations of a disorder. Thus, before a complete evaluation of this individual's RFC can be made, a full description of the individual's prior work record, daily activities and any additional statements from the claimant, his or her treating physician or other third party relative to the alleged pain must be considered. Only then is it possible to fully assess whether the pain is reasonably consistent

26

with the objective medical findings and to determine RFC. <u>Avery</u>, 797 F.2d 19, 23 (1st Cir. 1986). In making this determination, the ALJ should rely on a number of factors including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain or other symptoms; (5) treatment, other than medications, received to relieve pain or other symptoms; (6) measures used by plaintiff to relieve pain or other symptoms; and (7) any other factors relating to claimant's functional limitations and restrictions due to pain. <u>See</u> 20 C.F.R. § 416.929(c)(3).

Here, the ALJ found no objective basis for the back pain. He explained that "[the plaintiff's] physical examinations were all relatively benign; he was frequently noted for full range of motion, normal sensation, negative straight-leg raise test, and normal motor strength." (Tr. at 12.) The ALJ further ruled that "no treating sources indicated any work-place limitations or restrictions due to back pain, nor is there any evidence documenting such." (Tr. at 15.) Substantial evidence in the record supports both of these conclusions.

The ALJ then turned to the <u>Avery</u> factors. Considering the plaintiff's daily activities, the ALJ held that the plaintiff

"has no problems with personal needs, shopping, socializing, or performing household duties." (Tr. at 18.) Moreover, the ALJ questioned the plaintiff's credibility due to his drug-seeking behavior and lack of truthfulness in reporting to treating physicians that he was taking drugs. The ALJ reported that the plaintiff's desire to obtain narcotics "likely caused him to exaggerate the severity of his pain." (Tr. at 15.)

This conclusion, too, is supported by substantial evidence. The record does contain ample evidence of the plaintiff's drug-seeking and dishonest behavior, both of which undermine the credibility of his complaints of pain. The plaintiff told doctors that his prescriptions were stolen twice; his girlfriend washed his pants with his prescription; he fell down eight stairs; had been in a car accident; slipped on ice; and hurt his back mixing cement in order to obtain prescription pain medication. (TR at 530; 662; 532; 598; 243; 592; 588; 593.) The ALJ's determination that the plaintiff's back pain is not as severe as the plaintiff alleges is, thus, supported by substantial evidence.

2. <u>Mental Impairment</u>

The plaintiff also argues that the ALJ failed to give the opinion of the plaintiff's treating therapist sufficient weight in finding that the plaintiff's anxiety and depression were not severe. To determine the severity of a mental ailment the ALJ

must first "evaluate [the plaintiff's] pertinent symptoms, signs, and laboratory findings to determine whether [he has] a medically determinable mental impairment." 20 CFR § 404.120a(b)(1). Then, the ALJ must examine "the extent to which [plaintiff's] impairment interferes with [his] ability to function independently, appropriately, effectively, and on a sustained basis." Id. § 404.120a(c)(2). As long as the claimant has not experienced an episode of decompensation, if activities of daily living; social functioning; and concentration, persistence, or pace are listed as mild or none then the impairment is not considered severe. Id. § 404.120a(d)(1).

The plaintiff claims that his therapist, Ms. Wilson, is the only one who extensively treated the plaintiff and, therefore, her opinion should carry more weight than the ALJ gave it credit. Ms. Wilson treated plaintiff for a year, and noted that the plaintiff had a "decreased memory, decreased social interactions, and decreased adaptation abilities." (Tr. 789-789.) Normally, the ALJ should give considerable weight to the opinion of the claimant's health care service providers. However, in this case, there are a number of reasons why the ALJ was justified in not relying on Ms. Wilson's opinion. First, as a therapist, Ms. Wilson is not an acceptable medical source, and, therefore, her opinion cannot on its own establish the existence of a medically determinable impairment. See 20 C.F.R. §§ 404.1513(a),

416.913(a). More importantly, however, the ALJ deemed her opinion unreliable in light of the fact that it was inconsistent with the rest of the record and insufficiently rigorous to provide a medical diagnosis. Despite the fact that Ms. Wilson treated the plaintiff for a year, she never conducted a full mental examination. (Tr. at 699.) Moreover, a psychiatrist noted on her report that Ms. Wilson's comments were "not. . . adequately evaluated for a definitive diagnosis, much less for a disabling impairment." (Tr. at 700.) Further, the ALJ found that her overall treatment notes contradicted her findings. (Tr. at 19.) Ms. Wilson noted that the plaintiff exhibited a high level of functioning during treatment, including maintaining his home and car, but nonetheless gave the plaintiff a score suggestive of a significant impairment. (Id.) Finally, Ms. Wilson's opinion was inconsistent with the bulk of the evidence before the ALJ, including the plaintiff's repeated denials of depression or anxiety. (Tr. 475, 495, 501.) All of these considerations provide a reasonable basis for the ALJ's decision to disregard Ms. Wilson's opinion.

The plaintiff also argues that the ALJ should have given more weight to Dr. Gitlow's opinion, provided after a full consultative medical examination in July 2008. Dr. Gitlow concluded that the plaintiff's "psychiatric symptoms alone are causing a moderate impairment of concentration, persistence, and

pace," but found that these symptoms did not cause social problems or difficulties in tasks of daily living. (Tr. 772.) The plaintiff's ability to perform these activities was, however, impacted by his "nonpsychiatric medical issues," including side effects arising from his use of prescribed opioids. (Tr. 771, 772.) In describing Dr. Gitlow's opinion, the ALJ noted Gitlow found that there were no "limitations in social functioning or activities of daily living[, but that t]here was a moderate limitation in attention and concentration that was likely due to being overmedicated." (Tr. 16.) This characterization is not entirely accurate, as Dr. Gitlow in fact observed that the plaintiff had moderate limitations resulting solely from his psychiatric issues. Nonetheless, this error does not undermine the ALJ's conclusions. The ALJ correctly noted that Dr. Gitlow did not find any limitations in social relationships or tasks of daily living. The ALJ also correctly noted that the impact the plaintiff's "nonpsychiatric" issues had on these activities indeed arose primarily from the side effects of his medications. Even if Dr. Gitlow did not believe that the plaintiff had a "substance use" disorder, he recognized that more "attention should be given regarding those medications." (Tr. at 772.) Finally, Dr. Gitlow's opinion was based on a single examination in 2008. Even if the ALJ had correctly characterized Dr. Gitlow's opinion, it would have been reasonable to give more

weight to opinions derived from more recent examinations.

As opposed to Dr. Gitlow and Ms. Wilson's opinions, the ALJ heavily relied on the analysis of Marsha Tracy a state agency psychiatrist who worked for Disability Determination Services. (Tr. at 19.)  In February of 2009, Dr. Tracy found that the plaintiff suffered mild limitations in activities of daily living, maintaining social functioning, and concentration/persistence/pace and concluded that the plaintiff's mental health problems were not severe. (Tr. at 907.)  The ALJ gave this conclusion considerable weight because it was based on a fairly recent exam.  Moreover, the conclusion was consistent with the plaintiff's own reports in early 2009 that his anxiety and depression were stable. (Tr. 17; see also, Tr. at 495.) While the evidence regarding this issue is disputed and conflicting, considering the record as a whole, the ALJ's conclusion is supported by substantial evidence.

B.  **The ALJ properly found that the plaintiff could participate in substantial gainful activity**

The ALJ found that the plaintiff has the residual capacity to perform sedentary work with the exception of "no overhead use of the right upper extremity; no use of the right upper extremity for pushing or pulling arm controls; no exposure to extreme levels of dust, fumes, or temperatures, and no use of dangerous

machinery or cutting tools." (Tr. at 12.)  The ALJ based this conclusion on the fact that the medical record reflected benign medical findings coupled with the fact that "no treating source has provided a functional assessment indicating limitations that would preclude work." (Tr. at 18.)

The ALJ had substantial evidence to make these findings. Plaintiff's burn specialist Dr. Harrington noted that there were no pain restrictions and a normal range of motion despite the plaintiff's accident.  Dr. Foster, in October 2008, found that the plaintiff's pain was not consistent with the surgical findings.  (Tr. at 977.)  Finally, Dr. Pella, the medical expert at the hearing, felt the plaintiff should be limited to sedentary work with "limited use of the upper extremity...and the usual respiratory precautions." (Tr. at 43.)

## C.  **Work**

If the plaintiff can no longer perform his past work, then the ALJ must determine if the plaintiff is "able to perform other work in the national economy in view of his age, education, and work experience."  Bowen, 482 U.S. at 142; see 20 CFR § 416.960(c)(2).  Here, the ALJ found that the plaintiff could no longer perform his previous work as a carpenter, maintenance manager, and mechanic; therefore, the burden shifted to the Commissioner to show that the plaintiff could perform work in significant numbers in the national economy. (Tr. at 19.)

In order to determine whether there are a significant number of jobs in the national economy, the ALJ may rely on the testimony of a vocational expert. In this case, the vocational expert testified in court that there are some sedentary security personnel work, sedentary assembly positions, and production assembly positions which the plaintiff could perform in the regional economy. (Tr. at 45.) The total number of jobs available in the regional economy was 1,050. (Id.) The ALJ accepted the vocational expert's testimony and found that it was consistent with information contained in the Dictionary of Occupational Titles. (Tr. at 20.)

The plaintiff asserts that the vocational expert's opinion was flawed because the expert did not take several factors into account. These factors included plaintiff's limitations in concentration, persistence, and pace, which both Dr. Gitlow and Dr. Phillips deemed moderate; the number of visits the plaintiff would have to make to the doctor; and his persistent headaches. (Pl. Br. at 33,34.)

The ALJ properly determined that these factors were not relevant to the analysis. First, even if the ALJ had accepted Dr. Gitlow and Dr. Phillips' conclusions with regard to the plaintiff's limitations, even moderate limitations in "basic mental demands" do not significantly affect the plaintiff's ability to do unskilled labor. Ortiz v. Secretary of Health and

<u>Human Services</u>, 890 F.2d 520, 527 (1st Cir. 1989).  Second, the ALJ found that many of the hospital visits by the plaintiff were attempts to obtain prescription drug medication.  Further, "there [was] nothing in the record to suggest the claimant suffers from such severe migraine headaches."  (Tr. at 17.)  The ALJ, thus, properly declined to ask the vocational expert to consider those factors.

The plaintiff also argued that even if the vocational expert's testimony properly considered all the appropriate factors, it did not identify a sufficient number of available jobs in the national economy.  There is no silver bullet for determining when the number of available jobs reaches the level of significance. <u>See</u> <u>March v. U.S. Com'r Social Sec. Admin.</u>, 2008 WL 5273725, *4 (W.D.La. 2008); cases collected in <u>Lombard v. Barnhart</u>, 2003 WL 22466178, *4 n.7 (D. Me. Oct. 31, 2003).  But given the full record in this case, the testimony of the vocational expert, and the ALJ's own reasoned judgment, the ALJ's determination was supported by substantial evidence.

<strong><u>ORDER</u></strong>

Plaintiff's Motion to Reverse the Decision of the Commissioner(Docket No. 15) is **<u>DENIED</u>**, and Defendant's Motion for an Order Affirming the Decision of the Commissioner is **<u>ALLOWED</u>** (Docket No. 19)*.*

/s/ Patti B. Saris     <br>PATTI B. SARIS              

United States District Judge